

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

July 28, 2026

**BY ECF**

The Honorable Valerie E. Caproni
United States District Court Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

>    Re:    *United States v. Joshua Schuster*, 25 Cr. 204 (VEC)

Dear Judge Caproni:

The Government respectfully submits this letter in advance of the August 11, 2026 sentencing of defendant Joshua Schuster.

Over years, Schuster defrauded his investors of approximately $13 million. Schuster represented that the investments would go toward developing real estate projects, but Schuster lied to investors to obtain their money and stole funds from accounts he controlled. He told these lies and plundered these accounts to fund his lifestyle, pay off other investors in a Ponzi-like fashion, and retain the appearance of success. Even after the defendant's businesses collapsed, he continued to defend his record and actions, both to his victims and through civil litigation. Balancing the seriousness and length of the defendant's criminal conduct, the need to promote deterrence and respect for the law, a sentence within the Guidelines Range of 51 to 63 months' incarceration is appropriate to serve the purposes of sentencing.

## I.    Offense Conduct

From at least 2016 to 2022, the defendant operated his own real estate development firm, Schuster Enterprises, which did business as Silverback. (PSR ¶ 7.) Silverback was headquartered in Manhattan and focused on high-end residential and mixed-use developments. Schuster presented the appearance of an elite developer, maintaining offices in a prominent Midtown space and promoting himself and his projects. He also broadcast a high-flying lifestyle.

Schuster raised money from investors, promising them equity in his real estate developments, and making representations as to the use of their funds. These provisions included terms requiring that funds only be used to develop specific projects and prohibiting commingling of funds. (PSR ¶¶ 8-9, 12-14.)

Schuster's fraud scheme began in or about 2018 and continued into 2022. Overall, Schuster stole in excess of $13 million. As a developer, Schuster raised and had access to tens of millions

of dollars in funds raised from investors and lent by financial institutions. Of these funds, at least approximately $9.6 million was obtained through fraud, millions of dollars of which were misappropriated. (PSR ¶ 10.) Schuster also misappropriated at least approximately $4.7 million by pilfering corporate accounts and monies over which he had a fiduciary duty to manage. (*Id.*) Schuster's fraud scheme was concentrated at three particular projects—(1) a large apartment building located in Gramercy Park; (2) a large apartment building located in Queens; and (3) a development project located in the Bronx.

Schuster misappropriated the funds he stole in at least three ways: (1) to pay for his personal expenses; (2) to pay other investors in a Ponzi-like fashion; and (3) to cover other unrelated business expenses and maintain the appearance of success and progress. Among other examples: In or about December 2019, Schuster raised $5 million from a victim, promising the victim that the funds would be used to develop the Gramercy Park project. Schuster's text messages show that, even as he was soliciting these funds, he knew they were necessary to cover unrelated business expenses, including payroll and to pay other investors. But Schuster continued to lie to the victim, and stole $5 million from him through his scheme. Among other things, Schuster used more than $2.3 million to pay off unrelated loans; $440,000 to pay off other investors; $400,000 in payroll expenses; $137,000 in credit card bills; and $100,000 in gambling debts. Of his credit card bills, these expenses included more than $15,000 in travel expenses and thousands of dollars in designer clothing. Schuster continued to lie to this victim, submitting additional capital calls for purported needs and fraudulently obtaining an additional approximately $711,000.

Schuster also defrauded this Gramercy Park development victim's son in relation to the development in the Bronx. Schuster solicited approximately $2.5 million on the basis of fraudulent pretenses. And he misappropriated large swaths of these funds, including to cover his credit card expenses, pay tuition at a New York City private school, and for other improper purposes. (PSR ¶ 21.)

Another victim, an institutional investor, suffered Schuster's misappropriation of the corporate accounts Schuster was entrusted to manage as the developer-fiduciary. Schuster misappropriated more than $1.8 million from these accounts, using the funds to, among other things, pay approximately $500,000 worth of Schuster's personal credit card expenses. (PSR ¶ 23.)

Schuster lied to, stole, and misappropriated funds relating to additional investor victims. All of these victims believed Schuster's pitch and trusted him with their funds and to develop projects. In reality, Schuster's lifestyle far outpaced his income, and his business was collapsing. For at least the final year of Schuster's business, Schuster failed to properly pay his employees' payroll taxes.

In or about 2021, several investors and business partners sued Schuster. And Schuster was the subject of press reporting concerning his business difficulties. Schuster aggressively defended himself in court and the court of public opinion. Notwithstanding these setbacks, however, Schuster continued to misappropriate funds until at least 2022.

## II.     Procedural History and Guidelines Range

On May 7, 2025, the defendant was arrested on the basis of Indictment 25 Cr. 204, which charged him with one count of wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2, and one count of securities fraud, in violation of Title 15, United States Code, Sections 78j(b), 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2. On February 27, 2026, the defendant pleaded guilty to Count Two of the Indictment (securities fraud), pursuant to a plea agreement. Pursuant to the plea agreement, Schuster is subject to an offense level of 24 and a criminal history category of I, resulting in a Guidelines range of 51 to 63 months' imprisonment. The Probation Department has calculated the same sentencing range and recommends a sentence of 36 months' imprisonment. (PSR at 28.)

## III.    The Sentencing Guidelines and Section 3553(a) Factors

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

**IV.    The Court Should Impose a Guidelines Sentence**

A sentence within the Guidelines Range is necessary to reflect the seriousness of the offense, promote deterrence, and advance the ends of sentencing.

The defendant committed an extremely serious crime. For at least approximately four years, the defendant stole millions of dollars from many victims. To lure those victims to harm, he promoted himself as successful and established, tied to profitable and promising projects. In reality, he intended to steal their money and, once he obtained it, he continued to lie to get away with it. The defendant's fraud was brazen. He lied to investors and plundered his accounts. He lied and stole, in large part, to fuel his extravagant personal spending and to maintain his veneer of success.

The nature of Schuster's conduct makes this case especially grave. His scheme was not impulsive; it was a calculated, multi-year effort involving repeated deception, forged trust, and deliberate concealment. The extended duration and sophistication of the fraud demonstrate sustained criminal intent and a willingness to repeatedly exploit victims over many years.

His crime severely harmed his victims, as can be seen by the victim-impact statements submitted in connection with sentencing and attached to this letter.

Harry Karten writes about the severe monetary and emotional harm Schuster's crimes have caused. (Ex. A.) He writes: "A scheme that steals a sum in a single transaction is one thing. A scheme that conscripts its victims over the course of 6 years into thousands and thousands of hours of unwitting participation—forcing them to labor over lies, to agonize over fabricated crises, to sacrifice irreplaceable years—is categorically worse . . . . Joshua Schuster did not just take money. He took *life*, measured in the most importance currency: time." Karten also writes about the emotional harm and manipulation he suffered at Schuster's hand: "Discovering that years of communications were deliberate lies and that the investment had been used on himself is a betrayal that does not resolve when the fraud is uncovered; it undermines your ability to trust your own judgment and to trust others . . . . Before we uncovered the stolen funds, Schuster went so far as to invite me to personal events and have his own children call me "Uncle Harry"—cultivating a false sense of familial closeness and personal trust designed to suppress the suspicion that was beginning to grow." This manipulation and lies, spread over the course of years, is aggravating and warrants a Guidelines sentence.

The defendant's criminal conduct also shows substantial hubris. The defendant cheated the Government and his employees, failing to make required payroll tax payments for at least a year of his business's operation. And, based on the PSR, it appears that the defendant has failed to timely file his own tax returns for 2022, 2023, and 2024. (PSR ¶ 92.) This conduct was not isolated; it reflects a broader pattern of disregarding legal obligations and undermining systems essential to employees and the public. His failure to pay payroll taxes, and his own delinquent filings,

demonstrate a consistent refusal to comply with basic legal requirements. Such behavior reinforces the need for a sentence that promotes respect for the law and adequately deters similar misconduct.

Even after the defendant faced lawsuits and negative press, he continued to lie and failed to take responsibility. In an interview with *The Real Deal*, the defendant characterized his business conduct as "by the book," blamed his victims for skewering him ("Whoever shoots first narrates the story"), and suggested his difficulties were attributable to the pandemic. *See*, How Josh Schuster's Silverback is weathering the storm, *The Real Deal*, (Mar. 15, 2022), https://www.youtube.com/watch?v=BN8nCfy833w. His claim that the Covid-19 pandemic explains his misconduct is particularly galling given that the defendant stole more than $6 million before the pandemic ever began. He also bragged about and defended his extravagant spending, including private air travel. The Court should consider this failure to reckon with his conduct when weighing the need for specific deterrence. The defendant's post-offense conduct is also a powerful indicator that leniency would be misplaced. Even after learning he was under scrutiny, he persisted in deflecting blame, mischaracterizing his conduct, and presenting himself publicly as a victim, behavior fundamentally inconsistent with remorse.

An incarceratory sentence is also necessary to advance the goal of general deterrence. The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense where defendant made approximately $11.5 million). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also, e.g., United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Stein*, No. 09 Cr. 377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed."); *United States* v. *Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

This case reflects precisely the kind of conduct Congress sought to deter through meaningful incarceration. Schuster's theft funded private flights, designer goods, gambling debts,

and other luxuries, showing that his motive was personal indulgence, not misguided business judgment. Absent a Guidelines sentence, other would-be offenders may conclude that prolonged, calculated frauds involving millions of dollars and exploited trust carry limited consequences. A substantial custodial sentence is necessary to reinforce that such crimes will be met with serious punishment.

The Court should also give consideration to avoiding unwarranted sentencing disparities between similarly situated defendants. Schuster's case is similar to *United States v. Barry Breeman*, 25 Cr. 211 (GHW) (S.D.N.Y.) Like Schuster, Breeman was also a real estate developer who defrauded his investors to the tune of approximately $13 million. Unlike Schuster, Breeman confessed his crimes to law enforcement once his scheme began to fall apart. Noting this self-disclosure, Judge Woods imposed a below-Guidelines sentence of 36 months' incarceration, which is the same sentence the Probation Department recommends here. However, imposing such a sentence on Schuster would create a disparity with Breeman, since Schuster has evinced little of the remorse and contrition expressed by Breeman. Far from Breeman's confession, for years, Schuster failed to adequately accept responsibility.

### Forfeiture and Restitution

As set forth in the defendant's plea agreement, the defendant consents to forfeiture in the amount of $13,830,665. The Government will file a proposed preliminary order of forfeiture in this amount in advance of sentencing. The Government also expects to seek restitution in a similar amount. The parties respectfully request the statutorily authorized additional 90-day period to finalize restitution.

### Conclusion

The Government respectfully requests that the Court impose a sentence within the Guidelines Range of 51 to 63 months' imprisonment.

Respectfully submitted,

JAY CLAYTON
United States Attorney for the
Southern District of New York

By:  *Daniel Nessim*
Daniel G. Nessim
Assistant United States Attorney
(212) 637-2486

cc: counsel of record (by ECF)

6

# EXHIBIT A

# VICTIM IMPACT STATEMENT

*United States v. Joshua Schuster*
Case No. 25-CR-00204 (S.D.N.Y.)
Before the Honorable Valerie Caproni

Submitted by Harry Karten

---

Your Honor,

My name is Harry Karten. I am the sole owner of JSIK International LLC and HK Realty LLC, both entities through which I invested substantial capital in a real estate development venture located at 359 2nd Avenue in Manhattan—a venture conceived, controlled, and ultimately plundered by Joshua Schuster. I write to this Court not merely as a financial victim, though the monetary losses are extreme, but as a man who has unfortunately had years of his life consumed, degraded, and stolen by a deliberate, sustained, and remorseless fraud.

## The Theft of Time

Courts rightly focus on financial restitution and the dollars that were misappropriated. But I urge this Court to also consider something that cannot be restored: *time*. Over the course of this fraud, I exchanged *thousands* of emails, calls and meetings with Joshua Schuster—carefully reading his fabrications about the project's finances, analyzing his fraudulent capital call requests that ultimately provoked further wire transfers, and attempting to verify an immeasurable number of claims that, unbeknownst to me, were lies from beginning to end. The hours I devoted to this— hours that should have been spent building my business, enjoying my family, tending to my health—number in the thousands (if not tens of thousands). They are gone forever.

The Court should weigh this theft of time as an aggravating factor in sentencing duration. A scheme that steals a sum in a single transaction is one thing. A scheme that conscripts its victims over the course of 6 years into thousands and thousands of hours of unwitting participation— forcing them to labor over lies, to agonize over fabricated crises, to sacrifice irreplaceable years—is categorically worse. Schuster understood this. It was his primary means of delaying consequences for himself. He knew he was stealing when he was doing it (as evidenced by his own admission in his last hearing before this Court where he plead guilty) yet protracted civil litigation actively as long as possible. Joshua Schuster did not just take money. He took *life*, measured in the most important currency: time.

**Financial Devastation**

The financial damage inflicted on me has been staggering. Funds invested through my wholly owned entities; JSIK International and HK Realty were diverted away from the Second Avenue project and into Schuster's personal accounts. He lied about where the money was going. He lied about the status of the construction. He lied about the need for additional capital infusions. Each dollar lost made it harder to walk away—precisely as he intended.

I do not live a luxurious life. The capital I entrusted to this project represented years of prudent saving and disciplined real estate investment over the course of the last 55 years of my 75 years of life. As such, this investment was not intended to be speculative. It was the accumulated product of a lifetime of work directed towards what was to be a legitimate, well-managed development. Instead, it was siphoned into Schuster's lifestyle of fraud.

When the full accounting is done—the stolen investment capital and the years of legal and professional consultant fees necessitated by Schuster's fraud (and his refusal to answer for it)—the total loss is well over **Six Million Dollars ($6,000,000)**. This was not money I could afford to lose to say the least. It represented the financial foundation of my life and my family's security. Its loss has been devastating in ways that compound daily, affecting every financial decision, every obligation, and every plan for the future that I can no longer make with confidence.

**A Life of Undeserved Luxury**

While I spent countless hours poring over emails and spreadsheets trying to understand where my investment stood, Joshua Schuster was spending the proceeds of his fraud on a lifestyle of extraordinary and wholly undeserved luxury. Investor funds—my funds—financed living in a sprawling duplex apartment, art, expensive jewelry for his wife (which probably has been hidden and not fully forfeited), worldwide vacations, high end restaurants, private school for his kids, etc. In essence a lifestyle of leisure that no honest dollar of his own could have sustained. He lived as though the money was his to enjoy, while I was told the project needed yet more capital to survive.

The lack of remorse in his conduct is difficult to overstate. Even after his fraud was uncovered, he had the brazenness to brag about flying on private planes in an online interview released publicly.

I mention all of this to show that this is not the behavior of someone who made a business miscalculation as he previously contended. This is the behavior of someone who viewed his investors as a personal revenue stream, to be milked through deception for as long as possible before the scheme was discovered. The Court should consider this callous, self-indulgent conduct in determining an appropriate sentence.

**Emotional and Personal Toll**

The emotional toll of this crime is immense and ongoing. Discovering that years of communications were deliberate lies and that the investment had been used on himself is a betrayal that does not resolve when the fraud is uncovered; it undermines your ability to trust your own judgment and to trust others.

Perhaps most insidiously, Schuster did not limit his manipulation to business communications. Before we uncovered the stolen funds, Schuster went so far as to invite me to personal events and have his own children call me "Uncle Harry"—cultivating a false sense of familial closeness and personal trust designed to suppress the suspicion that was beginning to grow.

This was calculated. I have learned the hard way that when an investor starts to question where their money is going, the fraudster's most effective tool is not a better spreadsheet—it is manufactured intimacy. By weaving me into his family's personal life, Schuster made it emotionally harder for me to confront the mounting evidence that something was deeply wrong. Every time one of his family members greeted me with warmth and affection, it reinforced a lie—the lie that I was dealing with an honest man.

I will spend whatever years I have left carrying the knowledge that a man I trusted used that trust as a weapon, deployed his own family to try and keep me docile, and slept comfortably while I lost so much trying to make sense of his lies. This deliberate emotional manipulation of using his own family as instruments of deception is among the most reprehensible aspects of his conduct, and *it speaks to the depth of his willingness to exploit human trust for personal gain.*

**On the Question of Sentencing and Facility**

My understanding is that Section 3553(a) directs the Court to consider, among other factors, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. I respectfully submit that each of these factors weighs heavily in favor of a very substantial sentence served in conditions that reflect the gravity of this crime.

If one were to add up the cumulative time stolen from everyone due to Schuster's actions—the investors, the subcontractors who were either paid late or never paid, the employees who worked without being paid under false pretenses, etc—it would greatly exceed the maximum sentence permissible by law here. As such, at the very least, I respectfully urge the Court to impose a sentence at (or at the very least near) the maximum sentence permitted by law for this crime. A sentence below the statutory maximum would not reflect the seriousness of this offense, would not provide just punishment, and would not afford adequate deterrence to others who might calculate that the rewards of long-running investment fraud outweigh its consequences. The

duration, scale, and deliberateness of this scheme place it squarely among the cases for which *the law set the ceiling where it did.*

I understand that defendants convicted of financial crimes are often designated to medium-security or minimum-security facilities. I respectfully submit that such a designation would be profoundly unjust in this case. A medium-security facility—with its relative comforts and accommodations—would simply be a continuation of the cushioned existence he has enjoyed with other people's siphoned money. It also sends the message that sophisticated financial predators can steal with relative impunity—that even when caught, the consequences are manageable.

**Conclusion**

I ask this Court to recommend designation to a facility commensurate with the scale and duration of his crimes for the maximum term of imprisonment permitted by law.

I thank the Court for the opportunity to be heard. I ask only that the sentence imposed reflect the full measure of what was taken— financial ruin numbering in the millions, emotional devastation that persists to this day, and the irrecoverable loss of years of productive life.

Respectfully submitted,

**Harry Karten**

Sole Owner, JSIK International LLC and HK Realty LLC

March 5, 2026

# EXHIBIT B

# Victim Impact Statement

Regarding Joshua Schuster - Restitution Request for $109,000
June 26, 2026

August Francis Young III
147 Manhattan Ave, Apt 4B
New York, NY 11206
929-331-6238
august@augustyoung.com

---

To the Honorable Judge and the United States Department of Justice,

My name is August Francis Young III. I submit this victim impact statement regarding Joshua Schuster and the compensation I earned but was not paid.

The detailed documentation supporting my claim, including the timeline, communications, payment records, court materials, and accounting of the money owed, is included separately in my submitted file titled Young_August_Restitution_Package_Joshua_Schuster_109000.zip. This statement is intended to explain the personal, financial, emotional, and psychological impact this experience has had on my life.

The amount owed to me is $109,000. While that amount is significant, the harm I experienced went far beyond the unpaid compensation itself.

Before this happened, I was optimistic. I was building my career. I had savings and investments. I believed in people. I believed in the future. I was working, creating, and trying to build a stable life for myself.

My working relationship with Joshua Schuster was not just a distant business relationship. There was already a personal connection. Members of my extended family knew Joshua during the early stages of his career and had supported him when others might not have. Because of that history, I entered the working relationship with a level of trust that I would not have extended to a stranger.

I believed in Joshua. I believed in his vision. I believed in the projects we were building and the idea that we were creating homes and communities where people could live, raise families, and build meaningful lives. I was proud of that mission. I was not simply working for a paycheck. I invested my time, energy, talent, and faith into something I believed would have a positive impact.

Our working relationship was built largely on trust, including a handshake understanding that my work would be compensated fairly. I relied on that trust and on repeated assurances that I would be paid.

At a certain point, payment stopped abruptly and without meaningful advance notice. This happened while I was traveling, which immediately disrupted my normal life and financial stability. I had structured my life around the expectation that I would continue to be paid for the work I was performing. When payment stopped, I was forced into survival mode without warning.

Eventually, my health insurance was also terminated. The sudden loss of income and insurance created significant stress, insecurity, and fear. I was left trying to manage basic financial and personal stability while waiting for compensation that I had already earned.

The harm was made worse by repeated promises that payment was coming. On numerous occasions, I was told that I would be paid, that payment was imminent, or that the situation would soon be resolved. I relied on those promises. Each assurance gave me hope that I could hold my life together long enough to be made whole.

But the promised payments did not come.

I continued believing that once I was paid, I would be able to reestablish my financial security. Instead, my situation kept deteriorating. I exhausted my resources while waiting for compensation that should have already been paid.

To survive, I was forced to sell investments and liquidate assets that I had spent years building. This included crypto and other investments that were intended to support my future. Those assets were not sold as part of a normal financial plan. They were sold under pressure to cover basic living expenses because compensation I had earned was not paid.

As time went on, I lost not only the unpaid compensation itself, but also much of the financial foundation I had built over many years. The damage became a cascading financial collapse. I was trying to survive day to day while waiting for money that should have already been paid to me.

I previously pursued this matter through a civil court action and assembled extensive documentation regarding the unpaid compensation. However, the emotional and psychological toll of continuing to fight while also trying to survive financially became overwhelming. Last year, I experienced a severe mental health breakdown, and I reached a point where I could no longer continue carrying the burden of the litigation. Having to step away from that process did not mean the harm was resolved. It meant that the harm had become so severe that I no longer had the capacity to keep fighting it on my own.

The emotional and psychological toll became severe. The repeated broken promises, uncertainty, and financial pressure exhausted me physically and mentally. I experienced numerous mental breakdowns and periods of depression, hopelessness, and emotional exhaustion.

Today, I am not the same person I was before this happened. I have become isolated. I struggle to work and function the way I once did. I have difficulty trusting people. I have difficulty forming or maintaining friendships and relationships. I have not been eating properly. I have been trying to start over, but the burden of this experience has affected nearly every part of my life.

The toll on my financial security has greatly affected my lifestyle, independence, and ability to participate normally in society. I have spent years surviving instead of living. The stress and depression caused by this situation have made it difficult to rebuild my life.

What makes this especially painful is that I genuinely believed in Joshua Schuster and in what we were building. This was not simply a business dispute to me. It was a relationship built on trust, shared vision, and repeated assurances that I would be paid. The betrayal of that trust caused damage far beyond financial loss.

I did not lose only the money I earned. I lost savings, investments, stability, trust, health, opportunity, and years of my life waiting for promises that never came.

No amount of restitution can restore the years that were lost or fully repair the emotional damage that resulted from this experience. However, restitution would acknowledge that the harm was real, that the losses were

significant, and that the consequences extended far beyond a balance sheet.

I respectfully ask the Court to consider not only the $109,000 financial loss documented in my submitted materials, but also the profound personal, emotional, psychological, and life-altering impact these actions have had on me when determining restitution and any other relief available to victims.

Thank you for your time and consideration.

Respectfully,

August Francis Young III